Cheshire County Probate Court
No. 80-068

## *In re* RONNIE PRIME

December 22, 1980

*Bell, Falk & Norton,* of Keene (*Arnold R. Falk* orally), for the petitionee, Ronnie Prime.

*Gregory H. Smith,* acting attorney general (*Jeffrey R. Cohen,* assistant attorney general, orally), for the State of New Hampshire.

DOUGLAS, J.   The issues in this case relate to a proceeding for involuntary commitment to the New Hampshire State Hospital under RSA 135-B:26 to :41.

On December 21, 1979, Sherwood Vachss, a State probation officer, filed a petition in the Cheshire County Probate Court seeking to have Ronnie Prime committed to the State Hospital. The petition alleged that Prime suffered from a mental illness that made him a danger to himself and others, as was demonstrated by his threats to his mother with a knife. It also stated that an Attorney Pappas was Prime's representative. RSA 135-B:28.

On that same day, a psychiatrist, Dr. Karin Mack, examined Prime and made a report which she later filed with the court. After a hearing on January 22, 1980, the Probate Court (*Espiefs,* J.) ordered Prime involuntarily committed to the State Hospital for a period not exceeding two years. He appeals that decision.

■■   The first question raised by Prime's appeal is whether the probate judge had discretion to question a witness. After Dr. Mack had been questioned by counsel for both parties, Judge Espiefs asked her several questions in an apparent attempt to satisfy himself that the psychiatrist believed that Prime's illness posed a "potentially serious likelihood of danger to himself or to others" as required by RSA 135-B:26. As long as a judge maintains his impartiality, he has the right to question a witness in order to clarify the testimony. *State v. Davis,* 83 N.H. 435, 436, 144 A. 124, 125 (1928). It is the judge's duty to understand the testimony since it is he, and not the medical expert, who must determine whether a patient's illness has met the statutory standard. *Dolcino v. Clifford,* 114 N.H. 420, 421, 321 A.2d 577, 578 (1974). In this case, Dr. Mack expressed her opinion that Prime "could possibly harm himself or others," terms which are at odds with the statutory language. The probate judge was within his discretion in asking several questions to gain a clearer understanding of the testimony.

■ ■   Prime's next argument is that there was insufficient evidence to support the court's order. For involuntary commitment, the State must prove beyond a reasonable doubt that an individual is potentially dangerous to himself or others. *Proctor v. Butler,* 117 N.H. 927, 935, 380 A.2d 673, 677–78 (1977). Before a court may

order involuntary commitment, "RSA 135-B:28 requires evidence of sufficiently recent 'specific acts or actions' showing potential dangerousness. . . ." *Id.*, 380 A.2d at 678. Prime argues that the actions alleged in the petition were too remote from the time of the hearing to meet that requirement and urges us to adopt the forty-day limitation period of RSA 135-B:19 (Supp. 1979). We refuse to do so for the obvious reason that stricter standards must apply to emergency commitments under RSA 135-B:19 than under RSA 135-B:26, because a proceeding under the former deprives a person of his liberty immediately while the latter affords an evidentiary hearing before commitment.

In this case, in two separate incidents in May 1979, Prime threatened his mother and his brother with a knife. He again approached his mother with a knife in September, smashing it through a door she had locked behind her. That same night he threatened to slit her throat. Considering that Prime's conduct shows a consistent pattern, we believe that his most recent act is sufficiently recent to show a potential for dangerousness even though the period between the latest incident and the filing of the petition was two and one-half months.

The words "mental illness" are defined in RSA 135-B:2 XI (Supp. 1979), which provides:

> "[A] substantial impairment of emotional processes, or of the ability to exercise conscious control of one's actions, or of the ability to perceive reality or to reason, which impairment is manifested by instances of extremely abnormal behavior or extremely faulty perceptions; it does not include impairment primarily caused by: (a) epilepsy; (b) mental retardation; (c) continuous or noncontinuous periods of intoxication caused by substances such as alcohol or drugs; (d) dependence upon or addiction to any substance such as alcohol or drugs."

Although Dr. Mack never defined "mental illness," she did testify that from October 1979 to January 1980 she had admitted six patients for emergency hospitalization. Since the definition of "mental illness" is the same for both emergency hospitalizations and involuntary admissions, it is reasonable to assume that she was aware of the appropriate standard.

Dr. Mack testified that, through her examination, she was able to test Prime's ability to think and reason and was able to discern that his judgment was impaired. She further testified that Prime was often easily distracted; had difficulty expressing himself; was

very vague; had difficulty explaining the circumstances surrounding why he was being reevaluated; why he was in jail and what should or should not happen to him. This testimony supports the judge's finding that Prime met the statutory definition of mental illness.

■ Prime further argues that Dr. Mack should have made specific findings that his mental impairment was not caused by epilepsy, mental retardation, or drug or alcohol intoxication or addiction. In her testimony, Dr. Mack stated that Prime "was somewhat retarded, but this was not the predominant part of the picture." That statement amounts to a finding that mental retardation was not the cause of Prime's illness. Common sense indicates that Dr. Mack made no findings as to epilepsy or drug or alcohol use because they were so obviously not the cause of Prime's instability. We do not require that a psychiatrist apply the statutory definition mechanically but only that a doctor address those elements that might reasonably be the cause of a patient's illness.

Finally, Ronnie Prime argues that Attorney Pappas was not a qualified representative. RSA 135-B:28 states that the petition for involuntary admission " . . . shall include: the name of the person sought to be admitted and his last known address; his representative and his last known address, *if any*" (emphasis added). That unambiguous language, coupled with the fact that the statute makes no express provision for appointment of a representative, indicates that a representative is not required in a proceeding for involuntary admission. Accordingly, we do not address the question.

Mr. Prime's interests were adequately protected by counsel and the evidence substantiates the decision of the probate judge.

*Affirmed.*

All concurred.