Nashua District Court
No. 2008-526

LYNETTE WALKER

v.

CLIFFORD WALKER

Argued: February 25, 2009
Opinion Issued: April 17, 2009

*Kalled Law Offices, PLLC*, of Ossipee (*John P. Kalled* on the brief and orally), for the plaintiff.

*Small & Lyons*, of Nashua (*Daniel R. Krislov* on the brief and orally), for the defendant.

HICKS, J. The defendant, Clifford Walker, appeals an order of the Trial Court (*Moore*, J.) granting the plaintiff, Lynette Walker, a final domestic violence protective order. *See* RSA 173-B:5 (Supp. 2008). We affirm.

The record supports the following. The plaintiff and defendant are married and have three minor children. At all times relevant to this appeal, the defendant lived and worked in Thetford, Vermont, while the plaintiff and children resided in Nashua. The defendant visited his wife and children on weekends. For several months prior to the domestic violence petition, the two had a series of "conversations" regarding whether the plaintiff intended to leave the defendant and seek custody of the children. After one of these conversations, the plaintiff researched "the laws . . . concerning custody," wrote "down several things" and placed them in her pocketbook.

During the 2008 Memorial Day weekend, while the family was at the plaintiff's family camp, the defendant came across the written materials in the plaintiff's pocketbook. The plaintiff maintains that the defendant searched her purse without permission, while the defendant claims that he "hooked" the open pocketbook as he walked by, causing it to fall and spill its contents. The two had another "discussion." The plaintiff testified that, upon finding this information, the defendant did not "trust [her], . . . was afraid that [she] was going to leave and . . . take the children, [and] . . . wanted [her] to immediately move to . . . Vermont with the children." She testified that he became upset after she declined. Although he did not strike or specifically threaten to strike her, the plaintiff interpreted his behavior as a threat to her life.

On the following Tuesday, May 27, 2008, the plaintiff petitioned for a temporary protective order. She alleged that she was in immediate danger because, upon finding the information in her pocketbook, the defendant stated to her that "he is coming to take [the children] at whatever cost and not to get in his way." She alleged that the defendant "ha[d] threatened [her] on numerous occasions that if [she left] him he would do whatever he had to do to take away [their] children," that he possessed a ".45 pistol[ and] numerous knives" and that he "carries [the] unregistered .45 pistol in

[their] vehicle at all times." Finally, she alleged that the defendant removed her credit cards, debit card and check book from her purse.

The Nashua District Court (*Leary*, J.) held an *ex parte* hearing the same day. The court questioned the plaintiff about her understanding of the alleged threat. She explained that she understood his threat as one to her life and safety and that she intended the allegation within her petition to convey as much. She elaborated that the allegations in her petition were only those from the most recent conversation and that the defendant specifically threatened her life on other recent occasions. During or just after the hearing, the court, with the plaintiff's permission, added the following sentence to the plaintiff's petition in the space for additional facts: "He has threatened to kill her in the past and plaintiff takes 'at whatever cost' . . . to mean to kill her[.]" It then granted a temporary protective order.

The District Court (*Moore*, J.) conducted a plenary hearing on June 4, 2008, at which it received evidence and heard sworn testimony from the plaintiff, the defendant and his mother.

The plaintiff testified that most of the defendant's recent threats have "been in reference to [their] children." The substance of the threats was either "to kill [her]" or to "do whatever [he has] to do to get [his] children back." Her understanding of the latter threat is that "he's saying the same thing no matter how it's phrased . . . , [that] if [she] should leave him and take [their] children, that he is going to do [her] physical harm." She testified that the defendant acquired a .45 pistol in April 2008, that he carries the pistol and often one knife from his collection, and that he has issued at least one threat to her while holding the firearm.

The defendant denied threatening the plaintiff. He testified that his statements meant that he would do anything to get custody of the children "within the means of the law." He testified that he took the plaintiff's credit cards, debit card and checkbook with her permission. The defendant's mother corroborated parts of his testimony.

After the plenary hearing, the court granted a final protective order. *See* RSA 173-B:5, I. It first ruled that the defendant committed criminal threatening, and found that a credible threat to the plaintiff's safety existed because "the Plaintiff reasonably believes that the Defendant has the ability to carry out his threats of physical harm."

The defendant moved for reconsideration. The trial court denied this motion. On appeal, the defendant argues that: (1) the trial court exceeded its authority by adding the explanatory text to the domestic violence petition; (2) denying his motion to reconsider was an unsustainable exercise of discretion; and (3) there was insufficient evidence in the record to support a finding of abuse.

"The purpose of [RSA chapter 173-B] is 'to preserve and protect the safety of the family unit for all family . . . members by entitling victims of domestic violence to immediate and effective police protection and judicial relief.' " *In the Matter of Morrill and Morrill*, 147 N.H. 116, 117 (2001) (quoting Laws 1979, 377:1, II).

"Any person may seek relief pursuant to RSA 173-B:5 by filing a petition . . . alleging abuse by the defendant." RSA 173-B:3, I (2002). " 'Abuse' means the commission or attempted commission of one or more [enumerated acts,]" RSA 173-B:1, I (2002), including "[c]riminal threatening as defined in RSA 631:4," RSA 173-B:1, I(b), when such act "constitutes a credible threat to the plaintiff's safety," RSA 173-B:1, I. The plaintiff must show abuse by a preponderance of the evidence. RSA 173-B:5, I. "A finding of abuse shall mean the defendant represents a credible threat to the safety of the plaintiff." *Id.*

I

The defendant first argues that the trial court lacked statutory authority to insert the explanatory sentence into the petition. The defendant's argument requires us to construe RSA 173-B:3, I.

> The interpretation of a statute is a question of law, which we review *de novo*. We are the final arbiter of the intent of the legislature as expressed in the words of the statute considered as a whole. We first examine the language of the statute, and, where possible, we ascribe the plain and ordinary meanings to the words used. When the language of a statute is clear on its face, its meaning is not subject to modification. We will neither consider what the legislature might have said nor add words that it did not see fit to include.

*In the Matter of Aldrich & Gauthier*, 156 N.H. 33, 34 (2007) (citations omitted).

The relevant text of RSA 173-B:3, I, provides that "[t]he plaintiff shall be permitted to supplement or amend the petition only if the defendant is provided an opportunity prior to the hearing to respond to the supplemental or amended petition." RSA 173-B:3, I. The defendant acknowledges that, prior to the final, plenary hearing, he received notice of the explanatory sentence inserted into the petition. The only question before us, therefore, is whether "[t]he plaintiff . . . supplement[ed] or amend[ed] the petition," RSA 173-B:3, I.

■■ We hold that the plaintiff, and not the court, amended the petition. This is primarily because the explanatory sentence merely clarified the

plaintiff's own allegation that the defendant threatened to take the children "at whatever cost." Although the court acted as scrivener by physically writing the explanatory text on the petition, the plaintiff effected the clarifying amendment through her testimony at the *ex parte* hearing. It is well within the court's power to document and record the clarification of an allegation in the interest of narrowing the issues to only those that are contested, *cf. In re Ronnie Prime*, 120 N.H. 849, 850 (1980) ("As long as a judge maintains his impartiality, he has the right to question a witness in order to clarify the testimony."), and facilitating meaningful judicial review of its disposition, *see In the Matter of Gordon and Gordon*, 147 N.H. 693, 700 (2002) (recognizing for purposes of child support award that, although no statute expressly requires trial court "to calculate the guidelines award before determining that an adjustment would be appropriate[,] . . . a specific finding . . . will facilitate our review").

The defendant further argues that the trial court compromised its impartiality by "act[ing] as the attorney for the Plaintiff" and prosecuting the action in violation of due process and separation of powers. We disagree.

■ ■ The State Constitution plainly forbids judges from acting as counsel to any party. *See* N.H. CONST. pt. II, art. 79. Consistent with this mandate, the court neither advocated for the plaintiff nor provided her with legal advice. Nor did it undertake any prosecutorial function. The court simply discharged its duty to determine and document whether the statutory standard was met. Temporary relief was warranted only if there was "an immediate and present danger of abuse," RSA 173-B:4, I (2002). In the course of its inquiry, the court sought to clarify an ambiguous allegation. "It is the judge's duty to understand the testimony since it is he . . . who must determine whether . . . the statutory standard" has been met. *In re Ronnie Prime*, 120 N.H. at 850; *see State v. Hause*, 82 N.H. 133, 138 (1925) (stating that court may ask witness questions because it "must understand the testimony . . . to be able properly to pass on motions and requests for rulings"). Indeed, temporary relief may not have been warranted had "at whatever cost" not been perceived as a threat to the plaintiff's well-being. *See* RSA 173-B:4, I (the court may enter temporary relief only "[u]pon a showing of an immediate and present danger of abuse").

## II

The plaintiff alleged in her petition that the defendant "went through [her] purse and took [her] credit cards, debit[] card, [and] check book (joint account)." She testified to the same at the final hearing. The day after the final hearing, once the final protective order was in place, the plaintiff

transmitted a note to the defendant, by way of her father, addressing various arrangements. The copy of the note provided to the court is difficult to read because the right edge has been removed in the copying process. However, it appears to state that the plaintiff would "send[] the checks from the che[cking] account as well as [her] debit card." Upon reviewing the note, the defendant moved for reconsideration before the trial court, arguing that it conclusively proves that the plaintiff "lied about a material fact," casting doubt upon all of her testimony. The trial court denied this motion.

On appeal, the defendant contends that denying his motion for reconsideration was an unsustainable exercise of discretion. He argues that "[a]t the very least, when confronted with such evidence so close to the delivery of its decision, the court should be required to rehear the matter in order to determine" the plaintiff's credibility. In the alternative, he argues that the trial court "should be required to vacate the order and dismiss the petition."

"We will uphold a trial court's decision on a motion for reconsideration absent an unsustainable exercise of discretion." *State v. Barkus*, 152 N.H. 701, 705 (2005). "To show that the trial court's decision is not sustainable, the defendant must demonstrate that the court's ruling was clearly untenable or unreasonable to the prejudice of his case." *State v. Lambert*, 147 N.H. 295, 296 (2001) (quotation omitted). Our inquiry is "whether the record establishes an objective basis sufficient to sustain the discretionary judgment made." *Id.*

The defendant has failed to carry his burden. First, it is unclear that the post-hearing note was indeed inconsistent with the plaintiff's testimony. She testified: "*At that time*, he had also removed from my pocketbook my credit cards, our debit card, the checkbook to our joint checking account . . . ." (Emphasis added.) The two statements would be consistent if the deprivation of her debit card and checkbook ended after the petition was filed and before the post-hearing note was sent to the defendant. Even assuming that the post-hearing note was somehow inconsistent with the plaintiff's testimony, we generally "defer to the trial court's credibility judgments." *Comer v. Tracey*, 156 N.H. 241, 247 (2007). Regardless, the defendant concedes that the "accusation [regarding the debit card and checkbook] was admittedly not essential to a finding of abuse." Accordingly, we find no error in the trial court's ruling denying the motion for reconsideration.

### III

The defendant argues that there is insufficient evidence to support the trial court's rulings because the plaintiff and defendant lived together on weekends during the alleged threats to her life. He also points to the

plaintiff's testimony agreeing that things between herself and the defendant were "okay" before she filed the petition. Thus, the defendant contends that, even assuming "that the [defendant] threatened to kill [the plaintiff] . . . [,] the threat is too distant in time . . . [to constitute] an ongoing, credible threat." (Quotation omitted.)

"We review sufficiency of the evidence claims as a matter of law and uphold the findings and rulings of the trial court unless they are lacking in evidential support or tainted by error of law." *In the Matter of Alexander and Evans*, 147 N.H. 441, 442 (2002) (quotation and brackets omitted). "We accord considerable weight to the trial court's judgments on the credibility of witnesses and the weight to be given testimony." *Comer*, 156 N.H. at 246. "We view the evidence in the light most favorable to the [plaintiff]." *Id.*

"Upon a showing of abuse of the plaintiff by a preponderance of the evidence, the court shall grant such relief as is necessary to bring about a cessation of abuse." RSA 173-B:5, I. "Abuse" is defined as having two elements: (1) commission or attempted commission of one or more of several criminal acts, including "[c]riminal threatening as defined in RSA 631:4," RSA 173-B:1, I(b); and (2) a finding that such misconduct "constitutes a credible threat to the plaintiff's safety," RSA 173-B:1, I. Because the defendant does not challenge the sufficiency of evidence that he criminally threatened the plaintiff, our inquiry is whether the threats "constitute[] a credible threat to the plaintiff's safety," RSA 173-B:1, I.

■ Incidents which are "too distant in time and non-specific" cannot support a finding of abuse under RSA chapter 173-B. *Fillmore v. Fillmore*, 147 N.H. 283, 286 (2001) (holding two incidents of physical abuse occurring eight and eleven years prior to the petition were insufficient to show current abuse). In addition, "a plaintiff . . . [must] show more than a generalized fear for personal safety based upon past physical violence and more recent non-violent harassment to support a finding that a credible threat to her safety exists." *Tosta v. Bullis*, 156 N.H. 763, 768 (2008).

■ The evidence, when viewed in the light most favorable to the plaintiff, established that the defendant's misconduct prompted the filing of the domestic violence petition and posed a credible threat to the plaintiff's safety at the time she filed the petition.

We previously concluded in *Tosta* that the link between the criminal misconduct and the filing of a domestic violence petition was attenuated where nine months passed between the two events, during which the parties lived together without physical violence. Conversely, the defendant in the instant case recently threatened the plaintiff's life multiple times, all within several weeks of her petition. The defendant issued at least one threat while holding a firearm. *Cf. id.* at 767 (allegations that defendant hit

plaintiff in past and "had recently followed her while armed with a knife" permitted reasonable inference that plaintiff was "at risk of further abuse").

Although the plaintiff agreed that things were "okay" during the weekend preceding her petition, she elaborated:

> We were at a family campground where there w[ere] probably somewhere between fifteen and twenty people right there, on the campground in the area. At that time, I did not feel like I was in any immediate danger. I had not done anything to make him further believe that I had intended to leave, and at that time, I felt . . . that things were under control enough that I just needed to get through the weekend, get away from the situation, and then proceed.

Further distinguishing this case from *Tosta*, where "the defendant's sudden and unexplained decision to *leave* . . . ultimately prompted her to file for a protective order," *id.* at 768, is the fact that here the plaintiff based her decision to leave upon the recent threats. Indeed, the plaintiff seized her first opportunity to petition the court on the Tuesday following Memorial Day weekend, when her husband had returned to Vermont.

Accordingly, there was sufficient evidence for the trial court to reasonably conclude that the criminal threatening prompted the domestic violence petition and constituted a credible threat at the time of the petition.

*Affirmed.*

BRODERICK C.J., and DALIANIS and DUGGAN, JJ., concurred.