NOTICE:  This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press.  Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

9th Circuit Court - Manchester Family Division
No. 2014-209

SUSAN ACHILLE

v.

GEORGE ACHILLE, JR.

Argued:  November 12, 2014
Opinion Issued:  May 27, 2015

Sheehan, Phinney, Bass + Green, P.A., of Manchester (John-Mark Turner and James F. Ogorchock on the brief, and Mr. Ogorchock orally), for the petitioner.

Primmer Piper Eggleston & Cramer, PC, of Manchester (Doreen F. Connor on the brief and orally), for the respondent.

BASSETT, J.  The respondent, George Achille, Jr., appeals several orders of the Circuit Court (Carbon, J.) arising from a domestic violence petition filed by the petitioner, Susan Achille, in which the trial court:  (1) vacated its earlier order which had continued the final hearing in the domestic violence proceeding; (2) denied the respondent's motion to recuse Judge Carbon from presiding over the domestic violence proceeding, despite having granted the respondent's motion to recuse in the parties' divorce proceeding; and (3)

entered a final domestic violence protective order. <u>See</u> RSA ch. 173-B (2014 & Supp. 2014). We affirm.

I

The following facts are derived from the trial court's orders or are otherwise drawn from the record. In June 2012, after the parties had been married for more than 30 years, the petitioner filed for a no-fault divorce. At the time, the parties lived in separate residences at the same address.

On the night of December 4, 2012, the respondent went to the petitioner's residence with a box that contained a gun and told her that he was going to use the gun. An argument ensued. The respondent then yelled at the petitioner, pursued her through the home, grabbed her by the hair, threw her against a counter, choked her, slammed a door on her, and pushed her to the floor. According to the petitioner, the respondent had also "hit [her] plenty of times" in the past, including in June 2012 when the respondent had "hit [her] across the face and dislocated [her] jaw." The respondent denied that the abuse occurred, and testified that, on December 4, the petitioner hit him with an umbrella and fell after tripping over a pair of boots.

The next day, the petitioner reported the incident to the police. At that time, she did not tell the police about the gun, press criminal charges against the respondent, or seek a protective order. Later that day, the parties had dinner together at a restaurant. On December 6, they drove together to Manchester for mediation regarding their pending divorce.

On December 7, the petitioner filed a domestic violence petition in which she described the incident that occurred in her home three days earlier. The court issued a temporary domestic violence protective order and scheduled a final hearing for later that month. On December 27, the petitioner wrote to the police, seeking to press charges against the respondent arising out of the December 4 incident. Criminal charges were subsequently filed against the respondent.

During the next year, at the respondent's request, the trial court repeatedly continued the final hearing in the domestic violence case. In December 2013, the trial court ordered that the hearing be rescheduled for "after October 1, 2014" when "the [respondent's] criminal matters have been resolved." Nonetheless, on January 24, 2014, the trial court, <u>sua</u> <u>sponte</u>, vacated its earlier scheduling order and ordered that the matter be set for a final hearing. The court observed that, although the "statutory framework envisions a final hearing within 30 days of the filing of the petition," the final hearing had "been continued multiple times" and 14 months had passed since the date of the petition. The final domestic violence hearing was scheduled for

2

March 6, 2014, the same day as the hearing on the merits in the parties' divorce.

On March 6, the day of the scheduled hearings, the respondent moved to recuse Judge Carbon from both the domestic violence and the divorce proceedings. He argued that recusal was required from both proceedings because the accountant who was scheduled to testify on the respondent's behalf during the divorce proceeding also provided financial services to Judge Carbon. The respondent asserted that, although the accountant "w[ould] not testify in the domestic violence proceeding," an "integral connection" existed between the domestic violence and the divorce proceedings such that Judge Carbon was required to recuse herself from both proceedings.

Following oral argument, Judge Carbon recused herself from the divorce proceeding, observing that the "Court could be accused of either giving undue preference to, or undervaluing the quality of, [the accountant's] testimony" during the divorce hearing. However, she denied the motion seeking her recusal from the domestic violence proceeding, explaining that there was "no conflict of interest, nor any appearance of possible bias resulting from a shared professional when that person has no role whatsoever" in the domestic violence case. Accordingly, Judge Carbon presided over the March 6 domestic violence hearing, and the parties' divorce proceeding was assigned to another judicial officer.

After the domestic violence hearing, the respondent filed a motion to dismiss the domestic violence petition, arguing that "the petition fail[ed] to allege conduct that could reasonably be construed to be abuse under RSA 173-B." The trial court denied the motion and granted a final domestic violence protective order. The trial court credited the petitioner's testimony and concluded "that Respondent has committed acts of abuse including simple assault (grabbing [petitioner's] hair, choking her, pushing her to the ground), in addition to threatening her with a firearm and restraining her movement. These are acts of abuse pursuant to RSA 173-B." The court also found that, given the "long history of abuse" and the fact that the "parties are involved in a contentious divorce," the respondent presented "a credible threat to Petitioner's on-going safety." This appeal followed.

II

The respondent first contends that, because the accountant's appearance as a witness in the divorce proceeding created an appearance of impropriety, Judge Carbon erred by not recusing herself from the domestic violence proceeding. Pursuant to the Code of Judicial Conduct, "[a] judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety." Sup. Ct. R. 38, Canon 1.2.

3

Thus, "the Code of Judicial Conduct requires disqualification of a judge in a proceeding in which the judge's impartiality might reasonably be questioned and to avoid even the appearance of impropriety." Miller v. Blackden, 154 N.H. 448, 456 (2006); see Sup. Ct. R. 38, Canon 2.11. "Whether an appearance of impropriety exists is determined under an objective standard, i.e., would a reasonable person, not the judge [her]self, question the impartiality of the court." Miller, 154 N.H. at 456 (quotation omitted). "The test for the appearance of partiality is an objective one, that is, whether an objective, disinterested observer, fully informed of the facts, would entertain significant doubt that justice would be done in the case." Id. (quotation omitted).

The respondent argues that Judge Carbon's disqualification from the domestic violence proceeding was required because an appearance of impropriety existed due to the accountant's "role in this case" as a witness in the divorce proceeding "and his current employment by the presiding fact finder." The respondent maintains that, once Judge Carbon recused herself from the divorce proceeding, she should have recused herself from "the case in its entirety," including the domestic violence proceeding, because "recusal on any portion of the proceedings demands complete separation from the case."

In response, the petitioner argues that Judge Carbon did not err because the accountant had "absolutely no role" in the domestic violence proceeding. The petitioner asserts that the parties' divorce is distinct from the domestic violence proceeding and that the respondent erroneously conflates the two. The petitioner also contends that the respondent waived his recusal argument because he waited until the day of the hearings to file the motion. Assuming, without deciding, that the respondent did not waive his recusal argument, we conclude that recusal was not required.

We initially observe that we need not decide whether the respondent is correct in asserting that recusal from one portion of a case requires recusal from the remainder of that case because his argument is premised upon an incorrect characterization of the domestic violence proceeding and the divorce proceeding as components of a single case. Rather, the proceedings are two separate cases.

First, we note that the petitioner sought a divorce based upon the ground of irreconcilable differences, and not based upon fault. See RSA 458:7-a (Supp. 2014). Consequently, the petitioner did not need to demonstrate one of the fault-based grounds, such as the "[e]xtreme cruelty of either party to the other," or that "either party has so treated the other as seriously to injure health or endanger reason." RSA 458:7, III, V (2004); cf. RSA 458:7-a. Therefore, in contrast to a fault-based divorce in which the outcome of a domestic violence proceeding could be relevant to the trial court's consideration of the fault-based grounds, in the context of a no-fault divorce — as we have

4

here — the outcome of a domestic violence proceeding is of little or no relevance.

Furthermore, RSA 458:7-a provides that "[i]n any pleading or hearing of a petition" for a no-fault divorce, "allegations or evidence of specific acts of misconduct shall be improper and inadmissible, except where parental rights and responsibilities are an issue . . . or at a hearing where it is determined by the court to be necessary to establish the existence of irreconcilable differences." However, neither exception is applicable here. Accordingly, allegations and evidence of specific acts of misconduct in this case would be improper and inadmissible, and the outcome in the domestic violence proceeding would not have had any impact on the divorce proceeding or the terms of the divorce decree. See RSA 458:7-a; see also In the Matter of Nassar & Nassar, 156 N.H. 769, 774 (2008) (stating that, in a no-fault divorce, fault is not considered on question of property division or alimony).

Further, we observe that a different docket number was assigned to each proceeding, and that the trial court did not consolidate the proceedings. Cf. Town of Nottingham v. Bonser, 146 N.H. 418, 426 (2001) (concluding that the fraud matter and the underlying zoning matter were the same case for purposes of Superior Court Rule 168 because, although the two had different docket numbers, "the cases more closely resembled bifurcated issues of a single matter" and the parties and the trial court treated them as a single case). Notably, the domestic violence proceeding here — in which the petitioner sought a protective order — served a very different purpose than the divorce proceeding. Moreover, although the two proceedings involved the same parties, different legal criteria and procedures applied in the two matters. Compare RSA ch. 173-B (governing domestic violence), with RSA ch. 458 (2004 & Supp. 2014) (governing, among other things, divorce). See also State v. Bader, 148 N.H. 265, 269-70 (2002) ("While the civil and criminal cases were grounded in the same facts, they cannot be equated, and the defendant's argument ignores the different standards and burdens of proof germane to each."). Given these important differences, we conclude that the two proceedings are separate and are not — contrary to the respondent's argument — different components of the same case.

The respondent also argues that, even if the two proceedings are separate, our decision in Blaisdell v. City of Rochester, 135 N.H. 589 (1992), required that Judge Carbon recuse herself from both proceedings. In Blaisdell, we held that a trial judge should have disqualified himself from a case in which he was "related within the third degree to a partner in a law firm representing a party-in-interest before that judge." Blaisdell, 135 N.H. at 592. Although that judge made no rulings in "two later related cases," we vacated orders issued by other judges in the subsequent cases because of the "pervasive appearance of partiality in the original case" and the fact that the original judge's rulings "were an integral part of the two later related cases." Id. at 594.

However, Blaisdell is distinguishable.  Unlike the judge in Blaisdell who failed to recuse himself despite the "appearance of partiality [that] permeate[d] the [original] proceeding," id., Judge Carbon recused herself from the divorce proceeding upon learning about the accountant's role in that proceeding.  Thus, in contrast to Blaisdell, any appearance of impropriety that may have existed in the divorce proceeding no longer existed as a result of Judge Carbon's recusal.  Accordingly, our decision in Blaisdell to vacate subsequent orders stemming from the "pervasive appearance of partiality in the original case," id., has no application here.

The respondent also argues that an appearance of impropriety existed when Judge Carbon presided over the domestic violence final hearing after recusing herself from the parties' divorce.  Although "the Code of Judicial Conduct requires disqualification of a judge in a proceeding in which the judge's impartiality might reasonably be questioned and to avoid even the appearance of impropriety[,] . . . [t]he test for the appearance of partiality is an objective one, that is, whether an objective, disinterested observer, fully informed of the facts, would entertain significant doubt that justice would be done in the case."  Miller, 154 N.H. at 456 (quotation omitted).

Here, it was the accountant's role as a witness in the divorce proceeding that caused Judge Carbon to recuse herself from that proceeding.  However, because the accountant was not to be involved in the domestic violence proceeding in any manner, we conclude that a disinterested observer, fully informed of the facts, would not, in fact, entertain doubt that justice would be done.  See id. at 455-56 (concluding that the trial judge did not err in failing to recuse himself because, although the judge had previously recused himself from cases involving the defendant's business partner, the present case did not involve that business partner).  Accordingly, we hold that Judge Carbon did not err by denying the motion to recuse herself from the domestic violence proceeding.

III

The respondent next argues that the trial court erred when it sua sponte vacated the continuance that it had previously granted, and ordered that the domestic violence matter be scheduled for a final hearing.

"The trial court has broad discretion in managing the proceedings before it."  In the Matter of Sawyer & Sawyer, 161 N.H. 11, 18 (2010) (quotation omitted).  "We review a trial court's rulings in this area under an unsustainable exercise of discretion standard."  Id. (quotation omitted).  "We will disturb decisions about motions to continue only if the [respondent] demonstrates that the decision was clearly unreasonable to the prejudice of his case."  Id. (quotation and ellipsis omitted).

6

The respondent asserts that the court "unsustainably exercised its discretion when ordering the Respondent to move forward with the domestic violence proceeding before the underlying criminal assault charges were concluded." He contends that the court's decision to accelerate the final domestic violence hearing "forced [him] to abandon his Fifth Amendment rights" in order to "defend himself from the allegations in the domestic violence proceeding." Relying upon federal case law, he further argues that the trial court should have utilized a multi-factor balancing test to determine whether the case should have been continued. See Microfinancial, Inc. v. Premier Holidays Intern., 385 F.3d 72, 78 (1st Cir. 2004). He contends that the factors identified in Microfinancial weighed in favor of continuing the domestic violence hearing until the criminal proceedings had concluded. Finally, the respondent asserts that, because the 30-day time period for scheduling hearings following the filing of a domestic violence petition, see RSA 173-B:3, VII (2014), is designed to protect only the interests of the party against whom the protective order was issued, and since he did not object to a further continuance, the trial court erred when it moved the final hearing forward.

As the petitioner correctly observes in her brief, we previously rejected an argument that is nearly identical to that which the respondent now makes regarding his Fifth Amendment rights. See In re Melissa M., 127 N.H. 710, 712 (1986). The respondent has not persuaded us to reach a different result in this case. "There is no constitutional right to a stay of a civil proceeding pending disposition of a related criminal case." Id. "The law thus recognizes the principle that protection of the public interest may often require proceeding simultaneously on two fronts, and that it would unduly compromise the public interest to force the government to choose between a civil and criminal course of action." Id. (quotation omitted). Additionally, continuing the domestic violence final hearing until the conclusion of the respondent's criminal proceedings — including any appeals — would have fostered delay, and thus contravened the high priority that the legislature has placed upon avoiding delay in domestic violence cases. See Knight v. Maher, 161 N.H. 742, 744-45 (2011) (stating that the purpose of RSA chapter 173-B is to preserve and protect the family unit by "entitling victims of domestic violence to immediate and effective police protection and judicial relief" (quotation omitted; emphasis added)). Accordingly, we conclude that the trial court's decision to hold the final hearing in March was not an unsustainable exercise of its discretion.

Equally unavailing is the respondent's assertion that a multi-part balancing test, which is utilized by some federal courts, see, e.g., Microfinancial, Inc., 385 F.3d at 78, should be employed in New Hampshire when a court "encounter[s] [a] civil continuance request[] because of [a] parallel or related criminal proceeding." We have never required the use of such a test. As we have stated, "[t]he trial court has broad discretion in managing the proceedings before it," and "[w]e review a trial court's rulings [regarding motions to continue] under an unsustainable exercise of discretion standard."

In the Matter of Sawyer & Sawyer, 161 N.H. at 18 (quotations omitted). Accordingly, the trial court's failure to employ a test that we have never required is not an unsustainable exercise of discretion.

Nor are we persuaded by the respondent's argument that the 30-day time period for domestic violence hearings protects only his interests. The respondent correctly notes that RSA 173-B:3, VII contemplates that, generally, a domestic violence hearing be held "within 30 days of the filing of [the] petition . . . or within 10 days of service of process upon the [respondent], whichever occurs later." However, the respondent's argument that this statutory timeframe protects only his interests ignores the broader purpose of RSA chapter 173-B. Although it is true that the 30-day timeframe set forth in RSA 173-B:3, VII protects the respondent's right to timely challenge the restraints placed upon him by another's allegations, see McCarthy v. Wheeler, 152 N.H. 643, 646 (2005), that timeframe also promotes the overall purpose of RSA chapter 173-B of "entitling victims of domestic violence to immediate and effective police protection and judicial relief," Knight, 161 N.H. at 744-45 (quotation omitted). Accordingly, we conclude that the respondent has failed to satisfy his burden to show that the trial court unsustainably exercised its discretion when it vacated its previous scheduling order and scheduled the domestic violence hearing for March 6, 2014.

IV

The respondent next argues that there was insufficient evidence presented at the final hearing to support entry of a final domestic violence protective order. See RSA 173-B:5 (2014). Relying primarily upon our decision in Tosta v. Bullis, 156 N.H. 763 (2008), the respondent maintains that the petitioner "did not sustain her burden of proof that Respondent's conduct constituted an ongoing credible threat of harm" because "the sole basis for her petition was an event that had occurred fourteen months" before the March 2014 final hearing. He further asserts that, given the petitioner's actions subsequent to the December 4, 2012 incident — including having dinner with him on December 5 and then traveling with him to the mediation the following day — the trial court erred in concluding that his actions constituted "abuse" that warranted entry of a final domestic violence protective order. We disagree.

We review sufficiency of the evidence claims as a matter of law, and uphold the findings and rulings of the trial court unless they are lacking in evidentiary support or tainted by error of law. Tosta, 156 N.H. at 767; see RSA 173-B:3, VI (2014). "When performing this review, we accord considerable weight to the trial court's judgments on the credibility of witnesses and the weight to be given testimony." Tosta, 156 N.H. at 767 (brackets and quotation omitted). "We view the evidence in the light most favorable to the [petitioner]." Walker v. Walker, 158 N.H. 602, 608 (2009) (quotation omitted).

"To obtain relief under RSA chapter 173-B, a [petitioner] must show 'abuse' by a preponderance of the evidence." Tosta, 156 N.H. at 767; see RSA 173-B:5, I (Supp. 2014). "Abuse" is defined as having two elements: (1) commission or attempted commission of one or more of several criminal acts, see RSA 173-B:1, I(a)-(h) (2014); and (2) a finding that such misconduct "constitute[s] a credible present threat to the petitioner's safety," RSA 173-B:1, I. See Walker, 158 N.H. at 608. The threshold misconduct that will support a finding of abuse need not immediately precede the filing of a domestic violence petition. Tosta, 156 N.H. at 767. The threat posed by such conduct to a petitioner's safety, however, must be ongoing. Id. Incidents that are too distant in time and non-specific cannot support a finding of abuse under RSA chapter 173-B. Walker, 158 N.H. at 608. Additionally, a petitioner must "show more than a generalized fear for personal safety based upon past physical violence and more recent non-violent harassment to support a finding that a credible threat to her safety exists." Id. (quotation omitted).

As to the first element, the trial court concluded that the petitioner "provided credible testimony of specific" criminal acts that occurred during the December 4 incident. The trial court determined that these criminal acts included simple assault and threatening with a firearm when the respondent brought a gun to the petitioner's home, stated that he would "use it," and then grabbed the petitioner by her hair, choked her, and pushed her to the ground. See RSA 173-B:1, I(a)-(b). Although conflicting testimony was presented at the final hearing regarding the December 4 incident, "we accord considerable weight to the trial court's judgments on the credibility of witnesses and the weight to be given testimony." Tosta, 156 N.H. at 767 (brackets and quotation omitted). We cannot conclude that the trial court erred in determining that sufficient evidence existed that the respondent committed one or more criminal acts against the petitioner on December 4. See RSA 173-B:1, I.

Regarding the second element, the respondent contends that, given the petitioner's actions in the days immediately following the December 4 incident, and the fact that the final hearing took place more than 14 months after the incident, the trial court erred in concluding that his "conduct constituted an ongoing credible threat of harm." We are not persuaded.

As a preliminary matter, the respondent asserts that the "present credible threat" determination must be made as of the time the domestic violence hearing takes place, and not as of the time that the petition was filed. Under the circumstances of this case, we need not resolve that issue. Regardless of whether the credible present threat determination is made as of the date of the final hearing or as of the date of the petition, there was sufficient evidence for the trial court to conclude that the respondent represented a credible present threat to the petitioner's safety.

To support his argument, the respondent relies upon our decision in Tosta. In Tosta, we concluded that "there was insufficient evidence to support a finding that the [respondent] represented a credible threat to the [petitioner]'s safety at the time she filed [the] domestic violence petition" because nine months had passed between the criminal misconduct and the filing of the petition, during which the parties lived together without physical violence. Tosta, 156 N.H. at 768. We explained that the "link between the [petitioner]'s request for protection and the [prior] assault was attenuated at best," and that the "only conclusion supported by . . . the evidence . . . [was] that some other forces, as opposed to the . . . assault, prompted the [petitioner] to seek a restraining order." Id. We, therefore, concluded that the trial court erred in entering a final domestic violence protective order. Id.

The present case is readily distinguishable: in contrast to Tosta, where the petitioner filed nine months after the alleged misconduct, here the petitioner filed her petition three days after the December 4 incident. Although the petitioner testified that she went to dinner with the respondent the night after the incident and traveled with him to the mediation the following day, she also explained that: (1) the dinner occurred in a public place and they drove there separately; (2) she did not want to "get [the respondent] angry" by changing their prior arrangements of driving together to the mediation; and (3) because the respondent was the one driving to the mediation, she did not feel threatened during that trip. This is in contrast to Tosta, where the parties lived together without physical violence for nine months following the alleged misconduct. See id.; cf. Walker, 158 N.H. at 609 (distinguishing Tosta because, although the plaintiff stated that things between her and the defendant had been "okay" during the weekend preceding her petition, the plaintiff explained that they were at a family campground with 15-20 other people and she did not feel in immediate danger at that time).

Further, the petitioner in Tosta testified that "the [respondent]'s sudden and unexplained decision to leave her home, as opposed to his affirmative display of some threatening behavior, . . . ultimately prompted her to file for a protective order." Tosta, 156 N.H. at 768 (emphasis in original). Here, in contrast, it was the respondent's misconduct on December 4, which included bringing a gun to the petitioner's home and choking her, that prompted the petitioner to file the domestic violence petition three days later. See Walker, 158 N.H. at 609 (similarly distinguishing Tosta). Accordingly, Tosta is not controlling here.

We also disagree with the respondent's assertion that certain evidence was too stale for the trial court to consider. See id. at 608 (noting that incidents that are too stale cannot support a finding of abuse). The specific evidence to which the respondent refers is the petitioner's testimony at the domestic violence hearing that the respondent had "hit [her] plenty of times" in the past, including on an occasion six months prior to the filing of the petition

10

when the respondent had "hit [her] across the face and dislocated [her] jaw." Although it is true that these events occurred at least 14 months before the date of the final hearing, it is important to note that none of our cases have suggested a bright-line rule as to when an incident becomes too stale. Compare Thompson v. D'Errico, 163 N.H. 20, 23 (2011) (finding no error in the trial court's reliance upon, among other acts, an attempted assault that occurred within six months of the filing of the petition), with Fillmore v. Fillmore, 147 N.H. 283, 284-86 (2001) (holding that two incidents of physical abuse occurring eight and eleven years prior to the petition were too stale to show current abuse). Additionally, while the mere passage of time is a factor for a trial court to consider, the nature and extent of the alleged misconduct are also important considerations. Here, the events at issue were neither minor nor isolated; rather, they evidenced an ongoing pattern of violent behavior, which culminated in the December 4 incident. In light of these circumstances, we are not persuaded that this evidence was too stale for the trial court to consider.

Accordingly, although more than a year had passed between the December 4 incident and the final hearing, given the serious nature of the incident and the "long history of abuse" as found by the trial court, we conclude that the trial court did not err when it determined that the respondent represented a credible present threat to the petitioner's safety.

V

The respondent has waived his argument concerning the trial court's admission of certain testimony. Although he raised the issue in his notice of appeal, he failed to brief it. See Waterfield v. Meredith Corp., 161 N.H. 707, 713 (2011) (concluding that "any issues raised in the notice of appeal, but not briefed, are deemed waived"). To the extent that the respondent asserts additional arguments, we conclude that they are not sufficiently developed to warrant judicial review. See Stewart v. Bader, 154 N.H. 75, 78 (2006) (noting that a mere laundry list of complaints regarding adverse rulings by the trial court, without developed legal argument, is insufficient to warrant appellate review).

Finally, the petitioner has requested that we award attorney's fees related to this appeal. We decline to do so because we conclude that the appeal has not "been frivolous or in bad faith." Sup. Ct. R. 23.

Affirmed.

DALIANIS, C.J., and CONBOY and LYNN, JJ., concurred.

11