# THE STATE OF NEW HAMPSHIRE

# SUPREME COURT

**In Case No. 2019-0030, <u>In the Matter of James J. Miller and Janet S. Todd</u>, the court on June 24, 2019, issued the following order:**

The petitioner's request in his reply brief to strike a portion of the respondent's brief is denied. Having considered the briefs and record submitted on appeal, we conclude that oral argument is unnecessary in this case. <u>See</u> <u>Sup. Ct. R.</u> 18(1). We affirm.

The petitioner, James J. Miller (father), appeals an order of the Circuit Court (<u>Pendleton</u>, J.) denying his request to modify the parenting plan for his children with the respondent, Janet S. Todd (mother). He contends that the trial court erred by denying him: (1) primary residential responsibility for the children, who were 15 and 16 years old at the time of the order; and (2) "an opportunity to review the audiotapes of [the] children's in camera interview" with the trial court.

We first address whether the trial court erred in denying the father's request for primary residential responsibility. The trial court has wide discretion in matters involving parental rights and responsibilities. <u>In the Matter of Miller & Todd</u>, 161 N.H. 630, 640 (2011). Our review is limited to determining whether the trial court clearly engaged in an unsustainable exercise of discretion. <u>Id</u>. This means that we review only whether the record establishes an objective basis sufficient to sustain the trial court's discretionary judgment; we will not disturb the trial court's determination if it could reasonably be made. <u>Id</u>. When determining matters of child custody, a trial court's overriding concern is the best interest of the child. <u>Id</u>.

RSA 461-A:11, I(c) (2018) allows a trial court to modify a final parenting plan if: (1) "the child's present environment is detrimental to the child's physical, mental, or emotional health"; <u>and</u> (2) "the advantage to the child of modifying the order outweighs the harm likely to be caused by a change in environment."

In this case, the trial court stated that, although "[t]he present environment at the mother's home is not optimal, . . . the risk of harm to the children posed by relocation [to the father's home in New York] is greater under the current circumstances." It further stated that "[w]hile . . . the mother continues to engage in unwarranted interference with the father's parenting[,] the Court cannot find modifying the parenting plan [to give the father primary residential responsibility is] in the best interest of the children." Thus, the trial court determined that the children's environment with the mother was

detrimental, but based its decision upon the children's best interests and upon its determination that the advantage to the children of modifying the parenting plan was outweighed by the probable harm from such a change in their primary residence.

The trial court found, and the record supports, that the children "are extremely adverse to relocating to . . . New York at this stage" and wish to remain in New Hampshire living with the mother and her parents, where they have lived most of their lives. They are entering their sophomore and junior years in high school respectively, are socially active, and are fully engaged in sports and extracurricular activities. Furthermore, each child has a long-term relationship with a counselor whom the child finds helpful. The father acknowledges that, if he were granted primary residential responsibility, the children "would be leaving the familiarity of [their] community, their friends, school, church and social organizations."

The father argues that the trial court did not "make any findings that the children are of sufficient maturity to express their opinions about residential placement." However, both children are nearing adulthood, they are "honor roll" students, the trial court met with the children, and the guardian ad litem (GAL), who met with them on several occasions, testified that they are mature minors. See In the Matter of Berg & Berg, 152 N.H. 658, 666 (2005) (stating that, when determining whether child is mature minor, trial court must consider: (1) child's age, intelligence, and maturity; (2) intensity of child's preference; and (3) any undesirable or improper influences on child's preference). We assume that the trial court made all subsidiary findings necessary to its general finding. See In the Matter of Kosek & Kosek, 151 N.H. 722, 725 (2005); RSA 461-A:11, I(e) (2018) (authorizing trial court to give "substantial weight" to mature minor's residential preference).

The father argues that the trial court gave too much weight to the children's preferences because the mother had unduly influenced them. The GAL reported that it was "impossible . . . to determine to what degree [the mother's] past behaviors . . . contributed to the [children's] current feelings about their father." However, she concluded that the children's "current view point is heavily based on their recent experiences with their father."

The GAL testified that the children used to have an "okay to good relationship with" the father. However, currently both children wish to spend less parenting time with him and "[n]either [child] envisions a relationship with their father into adulthood." The GAL identified a number of things the father had done that she believed had caused this change in his relationship with the children, including: (1) requiring the children to spend much of each weekend they are with him doing school work; (2) requiring them to spend a significant portion of their summer vacation with him reviewing the coming year's curriculum; (3) exhibiting a lack of interest in spending time bonding with the children during his parenting time, in spite of driving 500 miles every other

2

weekend to exercise it in New Hampshire; (4) searching a child's handbag without permission; (5) insisting on discussing personal gender-specific health issues that the children did not wish to share with him; (6) complaining about spending money to do things with the children during his parenting time; (7) storing unsecured firearms under a bed the children used in his home; (8) exposing the children to his brother's "rages," apparently caused by poorly controlled diabetes; (9) continuing to live with his brother approximately 500 miles from the children; and (10) frequently spending his weekend parenting time in a single hotel room with the children, which made them uncomfortable. She also testified regarding a recent incident when one child became hysterical in a restaurant bathroom after the father sought to examine the child's electronic tablet. The GAL testified that, "if [the father] had done some things differently, . . . they could have had a good relationship."

The father contends that the only way "to repair the damage done by [the mother's] parental alienation" is to grant him primary residential responsibility. He argues that the "children deserve an opportunity to rebuild their relationship with" him and that the benefits of this "outweigh[ ] any transitory disruption resulting from a relocation." He derides the trial court's recommendation of reunification therapy, which, in part, "focused on helping the father learn better ways of engaging with his children," stating that "[i]t defies common logic that additional therapy might somehow resolve these issues after 15 years." However, a previous GAL reported that both earlier attempts at reunification therapy had terminated because of the father's actions. See Miller, 161 N.H. at 638 (noting that trial court concluded father's conduct with both reunification therapists made their work nearly impossible). Furthermore, when asked how having primary residential responsibility would improve his relationships with the children, the father responded that it would allow them to attend therapy "a couple of times a week."

The GAL testified that the father could do things to improve his relationship with the children, other than demanding primary residential responsibility. She agreed with the trial court that different parenting arrangements might be possible if the father lived locally. The trial court queried "if this is truly about the kids," why the father had not moved to the area "to be a closer monitor to some of the issues that he complains of." The father testified that, other than repeatedly seeking primary residential responsibility, he had never sought to increase his parenting time with the children.

The GAL also suggested that, instead of taking the children to a hotel on his parenting weekends, the father rent a house in the area in which the children live to provide the children with a "more homelike" environment, where they would feel more comfortable and might be able to have friends visit. The father responded that the hotel room he typically used was "very homelike." The GAL testified that spending weekends in a single hotel room with their father was "awkward" for children of this age.

3

To the extent that the father argues that "the trial court departed from the requirements of RSA 461-A:11[,] I(c)" by employing a "best interest test," we disagree.  The trial court specifically addressed the statutory conditions and the children's best interest.  See Miller, 161 N.H. at 638, 644 (directing trial court to consider children's best interest when deciding father's motion to modify residential responsibility).  When weighing the advantage to the children of modifying the order against the harm likely to be caused by relocating them approximately 500 miles from where they have resided most of their lives, the trial court considered: the mother's "interference in the father's relationship with the children"; evidence that she "played games" communicating with him at times when the children have had medical needs; her "continue[d] efforts to influence the children"; and her failure to "engage[ ] in good co-parenting," all of which "create reasons for the children to align with the mother against the father."  However, the trial court correctly concluded that "[t]he findings as to the mother are not . . . the final determinative factor as to with whom the children primarily reside."  See RSA 461-A:11, I(c).

The trial court also considered the harm to the children from relocation, especially at their ages.  It noted:  issues with the father's parenting; his "rigidity and inability to compromise"; his "difficulty communicating his opinions and desires to the children in a manner that also conveys empathy and understanding"; his failure to spend "bonding time engaged in activities with the [children]"; the children's "extremely adverse" response to relocating; and their deep connections with the community in which they primarily live.  The court found the children's "alignment [with the mother] to be significant, but given the alternative of relocation to New York, largely understandable."

After weighing both the benefit and the harm to the children from the proposed relocation, the trial court concluded that the risk of harm to the children from relocating them outweighed the potential benefits.  We conclude that the record establishes an objective basis sufficient to sustain the trial court's discretionary decision to deny the father's motion to modify the parenting plan.  See Miller, 161 N.H. at 640.

We next address whether the trial court erred in denying the father's request to review the audiotape of its in camera conversation with the children.  The father represents that the parties agreed to the trial court meeting with the children, but did not "waive[ ] their rights to review the audio recordings."  The trial court met with the children in camera, with the GAL present.  The children were not sworn and did not testify.

Following the meeting, the trial court provided the parties with its written summary of the conversation, including that:  (1) "the children's responses to the Court [were] consistent with the GAL's prior reports"; (2) "the children . . . did not make any statements . . . directly implicating the mother in purposely engaging in discussions about the case or alienating the children"; (3) the children did not "indicate they were scared of being sexually assaulted or inappropriately touched

4

by the father"; and (4) the children "do not wish to expand visits with their father." The trial court concluded from the conversation that the children were "highly aligned with their mother."

The trial court then held an additional hearing to allow the parties to examine the GAL regarding the conversation. However, at that hearing, the father focused on other topics and did not question the GAL about the trial court's in camera discussion with the children.

The trial court has broad discretion in managing the proceedings before it. Achille v. Achille, 167 N.H. 706, 713 (2015). We review a trial court's rulings in this area under an unsustainable exercise of discretion standard. Id. To establish an unsustainable exercised of discretion, the father must show that the trial court's denial of his motion for access to the audiotape of its conversation with the children was clearly untenable or unreasonable to the prejudice of his case. See id.

The father argues that he should have been allowed to review the audiotape to "make [his] own determinations as to the veracity of anything the children might have said." However, the children were not under oath during their conversation with the trial court, and the trial court's goal was to understand the children's feelings, not to obtain facts. The father had the opportunity to confirm that this was the substance of the trial court's conversation by examining the GAL. However, he chose not to do so.

To the extent that the father argues that the trial court's procedure violated due process, he does not develop this argument. See State v. Blackmer, 149 N.H. 47, 49 (2003). To the extent that the father refers to cases from other jurisdictions, they do not reflect New Hampshire law. Nor does the record reflect that the father requested that the trial court employ any procedures used in other jurisdictions prior to its conversation with the children. Upon this record, we cannot conclude that the trial court's procedure was clearly untenable or unreasonable or that it prejudiced the father's case. See Achille, 167 N.H. at 713.

The mother's request in her brief for attorney's fees is denied.

Affirmed.

Lynn, C.J., and Hicks, Bassett, Hantz Marconi, and Donovan, JJ., concurred.

**Eileen Fox,
Clerk**